IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 19, 2003 Session

## STATE OF TENNESSEE v. THOMAS LEN PROFITT, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 74750     Richard R. Baumgartner, Judge**

_____

**No. E2002-02396-CCA-R3-CD**
**February 17, 2004**
_____

The defendant was convicted of aggravated vehicular homicide, aggravated assault, simple possession, and driving on a suspended license. The defendant contends on appeal that (1) there was insufficient evidence to support the convictions for aggravated vehicular homicide and aggravated assault, (2) the trial court erred in allowing evidence of inactive marijuana metabolites found in the defendant's blood after the accident, (3) the trial court erred in allowing evidence concerning extrapolation of the defendant's blood alcohol concentration back to the time of the accident, (4) the trial court erred in not allowing the defendant to plead guilty to driving on a suspended license, (5) the trial court erred in allowing evidence concerning extradition and instructing the jury on flight, and (6) the cumulative effect of the errors requires a new trial. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ., joined.

Mark E. Stephens, District Public Defender, and John Halstead, Assistant Public Defender, for the appellant, Thomas Len Profitt, Alias.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury returned an eleven-count indictment of the defendant, Thomas Len Profitt, Alias. He was charged with two alternative counts of vehicular homicide, at least two prior convictions for driving under the influence rendering the homicide aggravated, two alternative counts of aggravated assault, reckless endangerment, possession of a controlled substance, driving

on a suspended license, driving on a revoked license, driving on a canceled license, and driving without a license. The jury convicted the defendant of aggravated vehicular homicide (Class A felony), aggravated assault (Class C felony), simple possession (Class A misdemeanor), and driving on a suspended license (Class B misdemeanor). The trial court sentenced the defendant to twenty-five years for the aggravated vehicular homicide conviction, six years for the aggravated assault conviction, eleven months twenty-nine days for the simple possession conviction, and six months for the driving on a suspended license conviction. The sentences for the felony convictions were ordered to be served consecutively to each other and concurrently to the misdemeanor sentences, for a total effective sentence of thirty-one years. This appeal timely followed.

The defendant contends on appeal that (1) there was insufficient evidence to support the convictions for aggravated vehicular homicide and aggravated assault, (2) the trial court erred in allowing evidence of inactive marijuana metabolites found in the defendant's blood after the accident, (3) the trial court erred in allowing evidence concerning extrapolation of the defendant's blood alcohol concentration back to the time of the accident, (4) the trial court erred in not allowing the defendant to plead guilty to driving on a suspended license, (5) the trial court erred in allowing evidence concerning extradition and instructing the jury on flight, and (6) the cumulative effect of the errors requires a new trial. The judgments of the trial court are affirmed.

**Facts**

At around 11:00 p.m. on June 2, 2000, Christopher Rynes was traveling south towards Knoxville on Highway 33. Rynes was driving in the passing lane of the four-lane highway. He noticed a car approaching that was entirely in his lane of traffic. Rynes swerved onto the shoulder to avoid a collision. The other vehicle did not react. It passed by Rynes' vehicle "like [he] wasn't even there." He drove back through the area about twenty minutes later and found traffic at a standstill. A police officer on the scene informed Rynes that there was an accident up ahead. Rynes informed the officer about the close call with the vehicle earlier and described the car that almost hit him. The officer took Rynes to the accident scene, and Rynes positively identified the vehicle involved in the accident as the same one that almost hit him earlier. He learned later that the vehicle he described was being driven by the defendant. The distance from where Rynes was almost hit to the accident scene was three to four-tenths of a mile.

Kimberly Taylor was driving north on Highway 33 on the night of the accident. Taylor witnessed a vehicle that was in front of her slowly go over into the opposite lanes of traffic. It was entirely on the other side of the road. The driver of a truck that was between her and the defendant's vehicle honked his horn as the car drifted into the other lane. The defendant's vehicle did not react. Taylor said that the vehicle stayed in the opposite lanes for approximately ten to fifteen seconds. The area was a straight section of road on a downward slope. She then witnessed the defendant's vehicle slam into the passenger side of a vehicle going in the opposite direction.

On June 2, 2000, Bradley Lee was driving south on Highway 33, just north of Knoxville, with his fiancee', Misty Childress. The couple had been visiting Lee's grandmother and were on

their way to see Childress' mother. Lee was driving the vehicle hit by the defendant's vehicle. Lee has no memory of the impact. Lee was not speeding, and he was not under the influence of drugs or alcohol. He vaguely remembered screaming to the paramedics that he could not breathe. He also remembers asking them if Misty was all right. They did not answer. Misty Childress died on impact. Lee was extracted from the vehicle through the sunroof and airlifted to the hospital. He remained hospitalized for six months and was then transferred to a rehabilitation center. He remained there for two more months until his insurance coverage ran out. He returned to the hospital the following January for another six weeks. He then became able to walk again. At the time of the defendant's trial, nearly two years later, Lee still had not fully recovered.

Troopers Wesley Kitts and Carl Cagle worked the accident scene. Kitts stated that the passenger side of the defendant's vehicle collided with the passenger side of the victims' vehicle. There were skid marks from the victims' vehicle but none from the defendant's vehicle. No alcohol containers were found in the defendant's vehicle. The collision occurred in the outside lane of the highway. After leaving the scene of the accident, Cagle went to the hospital to have blood samples extracted from both drivers. He indicated that this was standard policy in accidents involving a fatality. Cagle advised the defendant that there was a death and that they were opening an investigation. They were not able to secure a blood sample from Lee because of the extent of his injuries. However, they were able to extract a sample from the defendant. The defendant was on a ventilator when Cagle arrived at the hospital. He said that he noticed the smell of alcohol emanating from the air being extracted by the ventilator. Cagle looked through the defendant's wallet to obtain his identification and discovered a small amount of a substance that looked like marijuana wrapped in cellophane.

The blood sample taken from the defendant and the substance found in the defendant's wallet were sent to the lab for testing. After the results of the tests run on those substances came back positive for alcohol and marijuana, a warrant was issued for the defendant. Cagle attempted to locate the defendant at his only known address, his parents' house, but he was unable to find the defendant. The warrant was issued approximately a month and a half after the accident. The defendant was later located in Florida and extradited back to Tennessee.

Celeste White and Dave Ferguson of the Tennessee Bureau of Investigation (T. B. I.) tested the substances obtained from the defendant. White confirmed that the substance found in the defendant's wallet was marijuana. Ferguson stated that the defendant's blood alcohol concentration was .05%. The defendant's blood sample was taken at 2:32 a.m. The police report indicates that the accident occurred three hours earlier at 11:32 p.m. Ferguson testified that the T. B. I. does not do extrapolations. He said that he did not know the necessary factors to do an extrapolation and that he would "have to take into account a person's race, their weight, ability to metabolize alcohol and break it down at which rate." He was only given a blood sample and no other information.

Tonya Horton, also with the T. B. I., analyzed the defendant's blood sample for the presence of drugs. The sample tested positive for the presence of an inactive marijuana metabolite. She did not test for the active metabolite, which remains in the blood for only two to four hours after

ingesting marijuana. Horton testified that the inactive metabolite could be detected in the bloodstream for days after ingestion, depending on the subject's usage pattern. She said that the inactive metabolite has no effect on a person. Horton was unable to determine when the defendant ingested the marijuana.

Dr. Kenneth Ferslew, a toxicologist and pharmacologist, testified on behalf of the State. Dr. Ferslew testified that he is able to do extrapolations of blood alcohol concentrations using "Widmark's hypothesis." He said that normal humans eliminate alcohol at an average rate of .017 per hour. However, he emphasized that this was only an average, and the actual rate would vary from person to person. For someone who never drank, the rate would be very low. For a chronic drinker, the rate would be high. In any event, the elimination rate would be from a low of .012 to a high of .024.

Dr. Ferslew calculated, based on averages, that the defendant's blood alcohol concentration was likely to be .101 at the time of the accident. He knew that the defendant's concentration was .05 three hours after the accident. Dr. Ferslew then assumed that the defendant had an average elimination rate of .017. He also assumed that the defendant was in the elimination phase during the entire three hours. The average elimination rate multiplied by three totaled .051. The level at the time of testing, .05, plus the amount eliminated, .051, equaled .101. However, Dr. Ferslew indicated that he could not determine the actual blood alcohol level of the defendant at the time of the accident.

Dr. Ferslew stated that there were too many unknown variables to perform an accurate extrapolation of the actual blood alcohol level. He said that he would also like to know things like the alcohol ingestion rate, what the defendant drank, how much he drank, when he started drinking, and when he stopped drinking. Dr. Ferslew testified that without knowing the variables involved, he could only accurately give a range of blood alcohol levels. Based on the lowest elimination rate of .012 and the highest rate of .024, the defendant's blood alcohol concentration would be anywhere from .086 to .122 at the time of the accident. Again, this was also assuming that the defendant was in the elimination phase for the entire three hours following the accident.

The doctor conceded that he did not know for sure that the defendant was in the elimination phase for the entire three hours. Prior to the elimination phase is the absorption phase. A person can remain in the absorption phase for fifteen minutes to two hours after consuming alcohol. The time depends on a person's consumption rate and pattern of usage. If someone has an empty stomach, the rate would likely be closer to fifteen minutes. If the person had consumed a large meal, the rate would probably be closer to two hours. There is no average known rate of absorption. It varies from person to person. Dr. Ferslew stated that if the defendant were in the post-absorption phase for only two hours, then his blood alcohol level would be in the range of .074 to .098.

Dr. Ferslew testified about the effects of marijuana on humans. He testified that the active marijuana metabolite can only be detected for fifteen minutes to one hour after ingestion. He stated that a person could stay high for up to four hours after the ingestion of marijuana. Dr. Ferslew testified that depending on how much a person smoked, when they smoked, and how often they

smoked, a single marijuana cigarette could usually be detected for three to five days. In a chronic smoker, it could be detected from days to weeks. Dr. Ferslew stated that from the test performed on the defendant's blood sample, it could not be determined when he used marijuana. He also testified that marijuana usage can affect both a person's ability to operate a motor vehicle and eye/hand coordination and can cause a distortion in perception, alteration in consciousness or attention span, and a loss of the ability to concentrate.

The doctor also testified about the effects of alcohol on a person. At .02%, a person starts to lose inhibitions and an expansion of the person's personality begins. Once a person gets in the .04% to .05% range, one would start seeing changes in judgment. Upon reaching the .08% to .10% range, one begins to see loss of motor skills, loss of coordination, altered judgment, alteration of attention span, and a loss of ability to concentrate. At a level of .05%, a person would have some degree of impairment from alcohol. It would affect things such as reaction time, eye/hand coordination, ability to concentrate, and judgment. A person would not see double or get blurred vision at a .05% level. All individuals demonstrate the effects of alcohol; however, the extent of the effects varies from person to person. When alcohol and marijuana are combined, there can be a synergistic effect. The two substances put together can have a greater effect than either would on its own.

## Analysis

The defendant contends on appeal that (1) there was insufficient evidence to support the convictions for aggravated vehicular homicide and aggravated assault, (2) the trial court erred in allowing evidence of inactive marijuana metabolites found in the defendant's blood after the accident, (3) the trial court erred in allowing evidence concerning extrapolation of the defendant's blood alcohol concentration back to the time of the accident, (4) the trial court erred in not allowing the defendant to plead guilty to driving on a suspended license, (5) the trial court erred in allowing evidence concerning extradition and instructing the jury on flight, and (6) the cumulative effect of the errors requires a new trial.

I. Sufficiency of Evidence

The defendant contends on appeal that the evidence is insufficient to support the convictions for aggravated vehicular homicide and aggravated assault. When a defendant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, (1979); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). This Court will not reweigh the evidence, reevaluate the evidence, or substitute its evidentiary inferences for those reached by the jury. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Furthermore, in a criminal

trial, great weight is given to the result reached by the jury. State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Once approved by the trial court, a jury verdict accredits the witnesses presented by the State and resolves all conflicts in favor of the State. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant then bears the burden of overcoming this presumption of guilt on appeal. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991).

A.  Aggravated Vehicular Homicide

The defendant first argues that the evidence is insufficient to prove that he was intoxicated at the time of the accident. Vehicular homicide by intoxication is "the reckless killing of another by the operation of an automobile . . . [as] the proximate result of the driver's intoxication as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213(a)(2). Section 55-10-401 prohibits, in pertinent part, a person from driving on the public roads and highways while under "the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system." Id. § 55-10-401(a)(1); see also id. § 39-13-213(a)(2) (providing that intoxication for purposes of the vehicular homicide statute includes both alcohol and drug intoxication). One commits aggravated vehicular homicide when the defendant has two or more previous convictions for driving under the influence of an intoxicant. Id. § 39-13-218(a)(1)(A).

The defendant inexplicably drove into oncoming traffic and struck the victims' vehicle, killing the passenger. Three hours after the accident, the defendant's blood alcohol concentration was .05%. Dr. Ferslew testified that the defendant's blood alcohol level at the time of the accident was likely to be in the range of .086% to .122%. Dr. Ferslew testified as to the effects of alcohol at different concentrations. He testified that, even at .05%, a person could be impaired. Additionally, Trooper Cagle smelled the odor of alcohol emanating from the defendant at the hospital. A jury could have concluded that the defendant was intoxicated by alcohol at the time of the accident.

A blood sample taken from the defendant indicated that he had used marijuana. However, the experts could not determine when the marijuana was actually ingested. Expert testimony revealed that the effects of marijuana can persist for up to four hours after ingestion. The defendant possessed marijuana at the time of the accident. The jury could have determined that the presence of the inactive marijuana metabolite in the defendant's blood, along with his possession of marijuana at the time of the accident, indicated that he was under the influence of marijuana at the time of the accident.

Additionally, even if the defendant's blood alcohol concentration or the marijuana ingested did not sufficiently impair the defendant on their own, Dr. Ferslew testified that the synergistic effect of both substances together could have caused the defendant to be intoxicated. Viewing the evidence in the light most favorable to the State, the evidence is sufficient to support the jury's determination that the defendant was intoxicated at the time of the accident.

The defendant next argues that the evidence is insufficient to prove that his intoxication was the proximate cause of the victim's death. The defendant contends that there are other reasonable explanations to explain why the defendant drove into oncoming traffic. The defendant submits that he was possibly asleep or not paying attention. These explanations were considered by the jury and rejected. As we have stated above, there was sufficient evidence to conclude that the defendant was intoxicated. It was rational for the jury to infer that the defendant's intoxication was the proximate cause of the accident and the subsequent death. This argument is without merit.

### B. Aggravated Assault

The defendant argues that the evidence is insufficient to support the conviction for aggravated assault. Specifically, he contends that the State failed to establish that he acted knowingly or intentionally. The defendant was convicted of aggravated assault by intentionally or knowingly causing bodily injury to another by use of a deadly weapon. See Tenn. Code Ann. § 39-13-102(a)(1)(B). The jury was instructed "that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." See id. § 39-11-302(a). The jury was instructed "that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." See id. at (b). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." See id.

The jury rejected the charge of reckless aggravated assault and found the defendant guilty of knowing aggravated assault. The evidence shows that defendant knowingly drove a vehicle while intoxicated. From the this evidence, the jury could have reasonably inferred that the defendant, while driving impaired, was aware that his conduct was reasonably certain to result in serious bodily injury. The evidence is sufficient to support the conviction for aggravated assault. This issue is without merit.

## II. Admission of Inactive Marijuana Metabolite Evidence

The defendant argues that evidence of the presence of the inactive marijuana metabolite in his blood was irrelevant to his intoxication at the time of the accident. He also argues that even if relevant, the probative value was substantially outweighed by the danger of unfair prejudice. Relevant evidence is evidence that tends to make a material fact more or less probable. Tenn. R. Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. 403. The crime of vehicular homicide by intoxication requires the State to prove that the defendant was intoxicated. Tenn. Code Ann. § 39-13-213(a)(2). Intoxicating substances include illegal drugs such as marijuana. Id. §§ 39-13-213(a)(2), 55-10-401(a). Expert testimony revealed that the metabolite could only be present because the defendant had used marijuana. Along with the fact that the defendant possessed marijuana at the time of the accident, the presence of the metabolite tended to make it more probable that the defendant had recently ingested marijuana and was intoxicated at the time of the accident. The trial court did not err in finding that the evidence was relevant.

Rule 403 places a heavy burden on a party seeking to exclude relevant evidence. State v. James, 81 S.W.3d 751, 757 (Tenn. 2002)(citing Roy v. Diamond, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999)). The exclusion of relevant evidence "'is an extraordinary remedy that should be used sparingly.'" Id. (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)). The defendant argues that the presence of the inactive metabolite was not probative of his intoxication at the time of the accident. The experts testified that they could not determine from the test results when the defendant ingested marijuana. Dr. Ferslew stated that ingestion could have been anywhere from a few minutes to weeks prior to the accident. The presence of the marijuana metabolite, along with the defendant's possession of marijuana at the time of the accident, supported a conclusion by the jury that the defendant had recently ingested marijuana and was intoxicated. The expert explained to the jury that the presence of the inactive metabolite did not necessarily mean that the defendant was under the influence of marijuana at the time of the accident. He testified that the effects of marijuana could last up to four hours from the time that it is ingested. The expert made it clear to the jury that the inactive metabolite itself would have no effect on a person. It was within the province of the jury to decide what weight to give to the evidence. The probative value of the evidence regarding the presence of the inactive marijuana metabolite was not outweighed by the danger of unfair prejudice. This argument is without merit.

III. Admission of Blood Alcohol Concentration Extrapolation Evidence

The defendant contends that the trial court erred in allowing testimony by Dr. Ferslew concerning blood alcohol level extrapolation back to the time of the collision. The defendant argues that there were too many unknown variables to consider the testimony reliable. The trial court found that extrapolation is a recognized field in which Dr. Ferslew was a qualified expert.

"If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. The trial court must exclude expert testimony "in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. Determinations concerning the admissibility of expert testimony, including the basis of the expert opinion, are within the discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993); see State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). However, the jury determines the weight and credibility of the expert's testimony. State v. Anderson, 880 S.W.2d 720, 732 (Tenn.

Crim. App. 1994). The standard of review on appeal is whether the trial court abused its discretion in admitting the expert testimony. State v. Reid, 91 S.W.3d 247, 294 (Tenn. 2002).

The defendant does not contest that Dr. Ferslew is a qualified expert. He argues that extrapolation is scientifically unreliable and did not substantially assist the jury in determining his intoxication. In deciding whether to admit expert testimony, the trial court must "determine whether the reasoning or methodology underlying the scientific evidence is sufficiently valid and reliable, and whether it can properly be applied to the facts at issue." McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 258 (Tenn. 1997). The trial court must be satisfied that the expert "opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." Id. at 265.

Dr. Ferslew testified that he could not determine the defendant's actual blood alcohol concentration at the time of the collision because of unknown variables. He was able to testify to a range of blood alcohol levels. It was within the province of the jury to accept or reject the expert's testimony. Even without the extrapolation evidence, the jury could have found that the defendant was intoxicated. His blood alcohol concentration three hours after the accident was .05%. A jury could infer intoxication at the time of the wreck based on his level of .05% when tested. State v. McKinney, 605 S.W.2d 842, 846 (Tenn. Crim. App. 1980) (test performed two and a half hours after the accident). The defendant smelled of alcohol after the accident. Additionally, the jury could have found that the defendant was intoxicated, based on his marijuana use alone. Also, even with a blood alcohol level below the presumptive level of intoxication, the synergistic effect of the marijuana and alcohol could have rendered the defendant intoxicated. Even without the extrapolation testimony, the evidence was sufficient to establish intoxication. Therefore, any error in admitting the evidence would have been harmless. This issue is without merit.

IV. Severance of Offenses

The defendant contends that the trial court erred in refusing to allow him to plead guilty to driving on a suspended license. The defendant wanted to plead guilty to the charge prior to trial and exclude from the jury any evidence that his license was suspended. Essentially, the defendant argues that the suspended license charge should have been severed from the remaining charges prior to trial because of unfair prejudice. He contends that the jury was free to speculate that the defendant's license was suspended because of a prior driving under the influence conviction. Rule 14(b)(2) states that offenses joined under Rule 8(a) may be severed before trial, if it is deemed necessary, to promote or achieve a fair determination of the defendant's guilt or innocence of each offense. Tenn. R. Crim. P. 14(b)(2)(i). This Court will not reverse a trial court's decision concerning severance of offenses, pursuant to Tennessee Rules of Criminal Procedure 8 and 14, absent an abuse of discretion. State v. Thompson, 88 S.W.3d 611, 613 (Tenn. Crim. App. 2000) (citations omitted). The defendant has failed to affirmatively show that he was prejudiced by the trial court's refusal to sever the offenses. The trial court did not abuse its discretion in refusing to sever the driving on a suspended license charge. This argument is without merit.

## V.  Evidence of Flight and Extradition

The defendant contends that the trial court erred in allowing the State to introduce a document showing that the defendant was extradited from Florida and instructing the jury on flight. The defendant argues that he did not "immediately" leave the "scene of the crime." Therefore, the evidence did not warrant an instruction on flight. Contrary to the defendant's argument, it is not necessary that the leaving be immediate or from the scene of the *crime*.

> "The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (quoting Rogers v. State, 2 Tenn. Crim. App. 491, 502, 455 S.W.2d 182, 187 (1970)).  It is proper for the trial court to instruct the jury on flight when the issue has been raised by the proof.  See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (jury instruction on flight is proper statement of the law).

Trooper Cagle informed the defendant that an investigation was being conducted because someone was killed.  The defendant knew that he had been drinking prior to the collision and that he possessed marijuana at the time of the collision.  Trooper Cagle attempted to serve an arrest warrant on the defendant 55 days after the event occurred.  The police were not able to locate the defendant at his parents' house, his only known address.  He was subsequently located in Florida and extradited back to Tennessee.  The evidence at trial sufficiently raised the issue of flight.  The trial court did not err in instructing the jury on flight.  Consequently, since the evidence raised the issue of flight, the document concerning extradition was relevant and admissible.  This argument is without merit.

## VI.  Cumulative Effect of Errors

The defendant contends that the cumulative effect of the errors raised on appeal warrants a new trial.  We recognize that while individual errors may not require relief, the combination of multiple errors may necessitate the reversal of a conviction.  See State v. Zimmerman, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991).  As we have discussed above, we find all of the issues raised by the defendant to be without merit.  Therefore, the defendant is not entitled to a new trial.

## Conclusion

Based on the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE